**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Allen Marden, | ) | |
| | ) | **ORDER GRANTING** |
| Plaintiff, | ) | **DEFENDANT'S MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| vs. | ) | |
| | ) | Case No. 1:11-cv-015 |
| Metropolitan Life Insurance Company, | ) | |
| | ) | |
| Defendant. | ) | |

Before the Court is the defendant Metropolitan Life Insurance Company's motion for

summary judgment filed on March 9, 2012. <u>See</u> Docket No. 27. The plaintiff, Allen Marden, filed

a response in opposition to the motion on April 13, 2012. <u>See</u> Docket No. 34. Metropolitan Life

Insurance Company ("MetLife") filed a reply brief on April 27, 2012. <u>See</u> Docket No. 39. For the

reasons explained below, the motion is granted.

I.      <u>**BACKGROUND**</u>

Allen Marden began working for BNSF Railways ("BNSF") on April 28, 1972. His final

title was Terminal Manager. MetLife issued a Long Term Disability Insurance plan ("the Plan") to

BNSF employees. The plan is governed by the Employee Retirement Income Security Act

("ERISA").

A.      <u>**TERMS OF THE PLAN**</u>

The Plan provides that MetLife reviews claims upon submission. If MetLife denies a claim,

an employee can appeal the decision. The appeal is also decided by MetLife. Under ERISA, if an

employee believes that MetLife has misused the Plan's money, the employee can file suit in federal court.

The Plan provides, in pertinent part:

In order to receive benefits under This Plan, you must provide to us at your expense, and subject to our satisfaction, all of the following documents. These are explained in this Certificate. Initial submission of these documents should be made no later than the 12th week following your original date of disability.

✓       Proof of Disability.

✓       Evidence of continuing Disability.

✓       Proof that you are under the Appropriate Care and Treatment of a Doctor throughout your Disability.

✓       Information about Other Income Benefits.

✓       Any other material information related to your Disability which may be requested by us.

. . .

**A.**      **Monthly Benefit**

You will be paid a Monthly Benefit, in accordance with Plan Highlights, if we determine that:

1.      you are Disabled; and

2.      you became Disabled while covered under This Plan.

. . .

**When Benefits End**

Monthly Benefits will end on the earliest of the following dates:

. . .

2.      the end of the period specified in the Limitation for Disabilities Due to Particular Conditions and the Limitation For Alcohol, Drug or Substance Abuse or Dependency;

. . .

**Definition of Disability**

"Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate care and Treatment from a Doctor on a continuing basis; and

3.      During the first 24 months, including your Elimination Period, due to your inability to perform the duties of your Own Occupation you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy; or

4.      after the first 24 month period, due to your inability to perform the duties of any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings, you are unable to earn more than 60% of your Indexed Predisability Earnings from any employer in your Local Economy.

. . .

**Limitation For Disabilities Due to Particular Conditions**
You are covered for 24 months of Disability during your lifetime if you are Disabled due to a:

. . .

2.      Neuromusculoskeletal and soft tissue disorder including, but not limited to, any disease or disorder of the spine or extremities and their surrounding soft tissue; including sprains and strains of joints and adjacent muscles, unless the Disability has objective evidence of:

        a.      seropositive arthritis;

        b.      spinal tumors, malignancy, or vascular malformations;

        c.      radiculopathies;

d.      myelopathies;

e.      traumatic spinal cord necrosis; or

f.      myopathies.

**Glossary of Terms Used in This Section**

. . .

Spinal:  Components of the bony spine or spinal cord.

. . .

Radiculopathies:   Disease of the peripheral nerve roots supported by objective clinical findings of nerve pathology.

Myelopathies: Disease of the spinal cord supported by objective clinical findings of spinal cord pathology.

. . .

Myopathies: Disease of the skeletal muscle supported by clinical, histological, biochemical and/or electrodiagnostic findings.

See Docket No. 28-3, pp. 64, 67-69, 75-76.


B.      **MARDEN'S MEDICAL AND CLAIM HISTORY**

On August 29, 2006, Marden visited Dr. Anthony Johnson complaining of "severe midline lumbar back pain."  See Docket No. 28-3, p. 27.  Dr. Johnson noted that Marden was "intact" neurologically and treated the pain as "an exacerbation of a chronic condition."  See Docket No. 28-3, p. 27.  Dr. Johnson prescribed Lorcet, Flexeril, and ibuprofen and recommended "[n]o work above or below the shoulders or below the waist, no lifting greater than 10 pounds, no walking on uneven ground or crawling, etc. for the next two weeks."  See Docket No. 28-3, p. 27.

On September 12, 2006, Marden underwent an MRI. The MRI showed "[m]ild desiccation of the lower three lumbar intervertebral discs. No evidence of disc herniation or lumbar canal stenosis. Verterbral body height, signal, and alignment is normal. Lumbar MRI is otherwise negative." See Docket No. 28-3, p. 29.

Marden visited Dr. Johnson on September 14, 2006. Dr. Johnson determined that Marden had "[b]ack pain with degenerative disk disease of the lower 3 lumbar vertebra." See Docket No. 28-3, p. 25. Dr. Johnson told Marden he may need to consider partial or full disability. He also recommended physical therapy and a referral to anesthesia for injections.

On November 3, 2006, Dr. Johnson advised Marden to find a desk job. He also recommended full or partial disability. Dr. Johnson stated Marden's diagnoses as "[d]isc desiccation with pain and some radiculopathy." See Docket No. 28-3, p. 23. Marden was referred to a neurosurgeon. See Docket No. 28-3, pp. 23-24.

On November 15, 2006, Marden visited a neurosurgeon, Dr. Alan Van Norman. Dr. Van Norman stated, "MRI scan reveals some loss of hydration of the lower three vertebral discs. There is no frank disc herniation. However, there is degeneration of these three discs." See Docket No. 28-3, p. 31. Dr. Van Norman advised that they "nurse Mr. Marden through his last six years of service with the railroad." See Docket No. 28-3, p. 32. Dr. Van Norman explained that surgery may not be helpful and recommended Marden use a back brace.

Marden visited Dr. Van Norman again on January 29, 2007. Dr. Van Norman recommended that for the next six weeks he avoid crawling, stooping, bending, jumping, lifting more than 10 pounds, crawling up and down ladders, or walking on uneven surfaces.

Marden became disabled on February 12, 2007, due to degenerative disc disease. On February 16, 2007, MetLife approved Marden's claim for short term disability benefits through March 16, 2007. See Docket No. 28-3, p. 34. On March 20, 2007, MetLife extended Marden's short term disability payments until August 11, 2007. See Docket No. 28-3, p. 15.

On March 12, 2007, Marden spoke with Dr. Van Norman. Dr. Van Norman stated surgery was not in Marden's best interests. He recommended that Marden consider long term disability or early retirement.

On May 31, 2007, Nancy Reese, a Long Term Disability Claims Specialist with MetLife, interviewed Marden. Marden stated that he was suffering from "3 discs in back that are bad" and was treating the pain with ibuprofen and hydrotherapy. See Docket No. 28-3, p. 116.

On June 25, 2007, Marden applied for long term disability benefits. See Docket No. 28-2, p. 143-50. Marden stated he cannot walk on uneven surfaces, climb a ladder, lift over ten pounds, bend, or stoop. He also stated he takes aspirin as needed for pain. See Docket No. 28-2, p. 143.

On June 29, 2007, Dr. Johnson provided an Attending Physician Statement. See Docket No. 28-2, pp. 121-23. He lists Marden's diagnoses as degenerative disc disease and radiculopathy. Under "Subjective Symptoms" he described Marden's symptoms as low back pain and radiculopathy. See Docket No. 28-2, p. 121. Under "Objective Findings" Dr. Johnson listed weakness of the lower extremities and loss of range of motion at the hip. He recommended that Marden adopt a sedentary lifestyle.

On July 20, 2007, MetLife approved Marden's request for long term disability benefits. See Docket No. 28-2, p. 115. Marden's disability benefits began on August 13, 2007. The letter from MetLife also states, "Your claim is approved under the Limited Benefit Condition. The limitation

for disability due to your condition is 24 monthly benefits in your lifetime. As your benefit commences on August 13, 2007 then benefit max is through August 12, 2009." <u>See</u> Docket No. 28-2, p. 115 (errors in original). MetLife also required Marden to apply for railroad retirement benefits.

On December 27, 2007, Dr. Johnson provided a Supplemental Attending Physician Statement. <u>See</u> Docket No. 28-2, pp. 63-65. Dr. Johnson again listed degenerative disc disease and radiculopathy as Marden's diagnoses. Dr. Johnson recommended that Marden adopt a sedentary lifestyle and perform physical therapy two to three times per week.

On January 30, 2008, Marden underwent a Functional Capacity Evaluation performed by Jeanne DeKrey. <u>See</u> Docket No. 28-2, pp. 29-37. DeKrey reported that Marden is able to perform sedentary work for eight hours a day, given that he be able to sit in twenty to thirty minute increments and stand for up to twenty minutes. <u>See</u> Docket No. 28-2, p. 37. On February 14, 2008, DeKrey revised her opinion and stated Marden was unable to meet sedentary work requirements because he could not sit up to 45 minutes at a time. <u>See</u> Docket No. 28-2, p. 26.

On December 18, 2008, Nancy Reese interviewed Marden again. <u>See</u> Docket No. 28-4, pp. 56-60. Marden stated he was suffering from degeneration of discs in his back and pain down his legs. He participated in hydrotherapy three to five times per week. He also stated that his doctor had recommended he not lift more then ten pounds and not walk on uneven surfaces.

On April 1, 2009, Marden visited a podiatrist, Dr. Kevin Koester. <u>See</u> Docket No. 28-2, pp. 6-7. Marden complained of burning and stabbing pain on the top of his feet. Dr. Koester stated:

> I do think that this is a neuropathic pain. I am guessing that it is coming from his back. I do not see any reason why it is coming from either the neck of his fibula nor on the dorsal aspect of his foot and these are two other potential pinched areas but I am not eluding his symptoms in from either one of these areas.

<u>See</u> Docket No. 28-2, p. 7. Marden visited Dr. Johnson on April 7, 2009, regarding his foot pain.

<u>See</u> Docket No. 28-2, p. 8. Dr. Johnson recommended that Marden take the Lyrica he had been

prescribed. Dr. Johnson stated that the pain is "possibly more of a neuropathy issue[]." <u>See</u> Docket

No. 28-2, p. 8.

On April 14, 2009, Laura Dougherty, a Long Term Disability Claims Specialist with

MetLife, called Marden. <u>See</u> Docket No. 28-4, p. 66. Dougherty informed Marden that his long

term disability benefits would be ending in August 2009. Marden stated that he had undergone

nerve conduction studies and the results were normal. He also stated that he was suffering back pain

that was shooting down into his feet and toes.

On April 16, 2009, Elizabeth Green, a Long Term Disability Claims Specialist with MetLife,

called Marden. <u>See</u> Docket No. 28-4, pp. 67-68. She asked Marden if he was being treated for

anything that may not be covered under the Limited Benefit Condition. Marden reported that he was

suffering severe pain radiating from his back to his legs, feet, and toes.

On May 19, 2009, Nancy Reese sent Marden a letter. <u>See</u> Docket No. 28-2, p. 4. The letter

states:

> Our records indicate that your claim is being paid under one of the conditions with
> a limitation of 24 months of benefits under this policy.
>
> Therefore, your benefits on this claim are scheduled to end on August 12, 2009. No
> additional benefits are payable after August 12, 2009 and your disability claim will
> have been paid in full in accordance with the terms of your employer's disability
> plan.

<u>See</u> Docket No. 28-2, p. 4. Reese also requested that Marden provided updated medical information.

### C.     **MARDEN'S APPEAL OF METLIFE'S DECISION**

On July 24, 2009, Marden sent MetLife a letter appealing its decision to discontinue his long term disability benefits.  The letter states:

> In your letter there is a list of six disorders which will continue my Long Term disability payments.  Seropsitive Arthritis to which facet Arthritis would fall under.  Radiculapathies to which Lumbar Radiculapathy fall into due to mid line bulge in the Degenerative Disc.
>
> . . .
>
> With the restrictions that both Dr. Johnson as well as Dr. VanNorman have placed on me I feel that Dr. Koester's indication of neuropathy in my feet are as debilitating as my back is.

See Docket No. 28-1, p. 103 (errors in original).

Dr. Barry Ostroff, an Independent Physician Consultant for MetLife, conducted a review of Marden's claim.  Dr. Ostroff spoke with Dr. Koester on September 9, 2009.  Dr. Koester stated "his impression was that the claimant's symptoms were related to nerve compression in his back."  See Docket No. 28-1, p. 72.  Dr. Ostroff also spoke with Dr. Kihtir, who "confirmed that the lower extremity electrodiagnostic testing that had been performed by Dr. [Greg] Peterson was negative for evidence of a lumbar radiculopathy or peripheral neuropathy and remarked that his testing was always extremely thorough."  See Docket No. 28-1, p. 73.  Dr. Kihtir also explained that when she saw Marden on July 21, 2009, he had "no neurological deficits."  See Docket No. 28-1, p. 73.  When Dr. Greg Peterson spoke with Dr. Ostroff, he explained "that the lower extremity EMG/NCV study performed on 3/11/09 was negative for evidence of radiculopathy, peripheral neuropathy, or focal neuropathy."  See Docket No. 28-1, p. 73.

Dr. Ostroff stated the following regarding lumbar radiculopathy:

This presumptive diagnosis was first listed by Dr. Johnson in his 11/3/06 office note but was not supported by lumbar MRI findings, clinical examination findings from any of the claimant's medical providers, or a 3/11/09 lower extremity electrodiagnostic study performed by Greg Peterson, MD, physiatrist. As noted above, the lumbar MRI findings were limited to degenerative disc disease without evidence of neural foraminal encroachment or nerve root compression. Neurological examinations recorded by the claimant's multiple medical providers lacked significant neurological deficits. The 3/11/09 lower extremity electrodiagnostic study performed by Dr. Peterson was reportedly negative for evidence of radiculopathy. Although the claimant complained of intermittent pain radiating to his legs, left greater than right, his clinical picture was more consistent with radiculitis related to degenerative lumbar disc disease and not radiculopathy which by definition would require evidence of actual damage to the nerve root at the level of the spine such as could occur with nerve root compression caused by a herniated disc. During my 9/9/09 teleconference with Dr. Kihtir, she confirmed that there was no evidence of nerve root compression and that the claimant had discogenic pain with some referral of pain to his legs due to nerve irritation.

See Docket No. 28-1, p. 74.

In Dr. Ostroff's report, under the question, "Does the medical information support continuous physical/psychiatric functional limitations related to identified diagnosis/conditions beyond 8/12/09?" Dr. Ostroff stated:

Yes, the medical information supported continuous physical functional limitations in this 57 year old Railway Terminal Manager beyond 8/12/09 due to chronic low back pain related to lumbar degenerative disc disease and possible facet arthritis that would limit his ability to stand, walk, climb, bend, twist, stoop, crouch, kneel, lift/carry, and push/pull. Sitting would also be limited if periodic position changes as required were not possible.

See Docket No. 28-1, p. 75.

On September 24, 2009, Christine Dewey, an Appeals Specialist with MetLife, sent letters to Dr. Peterson and Dr. Koester requesting that they comment on Dr. Ostroff's report. See Docket No. 28-1, pp. 84-85. Dewey also sent a letter to Marden stating that if his physicians did not respond, MetLife's determination would be made using the medical information on file. See Docket No. 28-1, p. 86. MetLife did not receive responses from Dr. Peterson or Dr. Koester.

On October 12, 2009, Christine Dewey sent a letter to Marden stating:

We have completed our review of the termination of your claim for disability benefits. For the following reasons, <u>the original determination to terminate benefits beyond August 12, 2009 is upheld upon appeal review</u>.

. . .

The provisions of your plan allow up to 24 months for disabilities due to neuromusculoskeletal and soft tissue disorders. We had determined that your diagnoses fall under this provision. Based on the information on file, long term disability benefits were approved August 13, 2007 and continued through August 12, 2009 at which time you had received the 24 months of disability benefits allowed by the Plan. This review is being conducted for the benefits beyond August 12, 2009. As part of the appeal process and to provide you with a full and fair appeal review, your file was referred to an independent Physician Consultant, Board Certified in Occupational Medicine.

The Consultant had a telephone conference with Dr. Sena Kihtir on September 9, 2009. . . . She stated that your problem was mainly low back pain with some mild radiation to your legs. She did not feel that there was evidence of nerve compression and thought that you had discogenic pain with some referral of pain to his legs with nerve irritation. . . .

The Consultant had a telephone conference with Dr. Peterson on September 9, 2009. Dr. Peterson stated that the lower extremity EMG/NCV study performed on March 11, 2009 were negative for evidence of radiculopathy, peripheral neuropathy, or focal neuropathy. . . .

. . . <u>The diagnosis of lumbar radiculopathy was first listed by Dr. Johnson in his November 3, 2006 office note but was not supported by lumbar MRI findings, clinical examination findings from any of your medical providers, or a March 11, 2009 lower extremity electrodiagnostic study performed by Greg Peterson, MD, physiatrist</u>. The lumbar MRI findings were limited to degenerative disc disease without evidence of neural foraminal encroachment or nerve root compression. <u>Neurological examinations recorded by your multiple medical providers lacked significant neurological deficits</u>. Although you complained of intermittent pain radiating to your legs, left greater than right, your clinical picture was more consistent with radiculitis related to degenerative lumbar disc disease and not radiculopathy which by definition would require evidence of actual damage to the nerve root at the level of the spine such as could occur with nerve root compression caused by a herniated disc. The Consultant also noted that during his September 9, 2009 teleconference with Dr. Kihtir, she confirmed that there was no evidence of

nerve root compression and that you had discogenic pain with some referral of pain to your legs due to nerve irritation.

The Consultant further noted that you had bilateral foot pain. The electrodiagnostic study did not reveal evidence of a radiculopathy, peripheral neuropathy, or focal neuropathy. Lumbar Facet Arthritis was first indicated by Dr. Kihtir in her June 18, 2009 office note and can explain your persistent complaints of chronic low back pain affecting your functionally without significant associated clinical exam findings. It is often associated with lumbar degenerative disease and may not respond to the facet injections currently recommended by Dr. Kihtir. The record did not contain laboratory or clinical exam evidence supporting the existence of seropositive arthritis.

In reviewing the information submitted on appeal, we examined your medical condition for the time frame beyond August 12, 2009. Your documented medical conditions causing your functional limitations during this time frame were displacement lumbar intervertrebal disc, chronic back pain, radiculopathy, facet arthritis, degenerative disc disease, bilateral foot pain. The diagnoses of displacement lumbar intervertrebral disc, chronic back pain, facet arthritis, degenerative disc disease, bilateral foot pain would fall under the 24-month neuromusculoskeletal and soft tissue disorders plan provision. During the time frame in question, there was no clinical evidence supporting the diagnoses of seropositive arthritis, spinal tumors, malignancy, or vascular malformations, myelopathies, injury or disease of the spinal cord resulting from traumatic injury with resulting paralysis or disease of muscle fibers, supported by pathological findings on biopsy or electromyography or other diagnosis not included in the neuromusculoskeletal and soft tissue disorder plan limitation. The diagnosis of radiculopathy was noted however was not supported by objective evidence. The record also did not contain laboratory or clinical exam evidence supporting the existence of seropositive arthritis.

. . .

Therefore, your diagnoses of displacement lumbar intervertebral disc, chronic back pain, radiculopathy, face arthritis, degenerative disc disease, bilateral foot pain. The diagnoses of displacement lumbar intervetebral disc, chronic back pain, facet arthritis, degenerative disc disease, bilateral foot pain would fall under the Limited Benefit Condition plan provision and are not payable beyond August 12, 2009, which is the maximum 24 months of benefits. <u>In reference to your diagnoses of radiculopathy, this diagnosis was not supported by objective clinical evidence as required by the plan. Therefore, the original claim determination was appropriate and your claim will remain terminated beyond August 12, 2009</u>.

. . .

You have exhausted your administrative remedies under the plan, and no further appeals will be considered.

See Docket No. 28-1, pp. 61-65 (errors in original) (emphasis added).


### D.    LITIGATION

Marden filed a complaint in federal district court on February 7, 2011.  See Docket No. 1.

Burlington Northern Santa Fe Railway Company, Burlington Northern Santa Fe Logistics LLC,

MetLife Affiliated Insurance Agency LLC, MetLife Associates LLC, MetLife Global Operations

Support Center Private Limited, MetLife Group Inc., MetLife Investors Distribution Company,

MetLife Securities Inc., and Metropolitan Life Insurance Company were named as defendants.  On

April 6, 2011, Marden agreed to dismiss all named defendants but Metropolitan Life Insurance

Company.  See Docket No. 12.

Marden filed an amended complaint against Metropolitan Life Insurance Company on April

11, 2011.  See Docket No. 16.  Marden states three causes of action.  In Count One, he alleges that

MetLife denied his medical charges claims in violation of the Employee Retirement Income Security

Act ("ERISA").  In Count Two, Marden alleges that MetLife violated ERISA when it denied his

long term disability benefits claim.  In Count Three, Marden alleges that MetLife wrongfully denied

and delayed payment of long term disability benefits in violation of ERISA.  Marden requests the

following damages:

1.    Any and all benefits payable under the Plan to reimburse Plaintiff for any and all relief he may be entitled to under the Plan pursuant to 29 U.S.C. § 1132(a)(1)(B);

2.    past and future medical, rehabilitation and medication expenses;

3.    pre-judgment and post-judgment interest as allowed by law;

4.     Plaintiff is entitled to recover his reasonable attorney's fees and costs of action pursuant to 29 U.S.C. § 1132(g);

5.     expenses related to the litigation of this claim, including but not limited to costs, witness fees, and expert witness fees, and

6.     such other and further relief as the Court may deem just and proper.

See Docket No. 16.

On March 9, 2012, MetLife filed a motion for summary judgment. See Docket No. 27. MetLife contends its decision to deny Marden's claim for long term disability benefits is supported by substantial evidence. Marden contends that genuine issues of material fact exist as to whether he has radiculopathy, and therefore can receive long term disability benefits past 24 months. In the alternative, Marden argues that he is entitled to summary judgment.


## II.     STANDARD OF REVIEW

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. Davison v. City of Minneapolis, Minn., 490 F.3d 648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(a). Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party.

The Court must inquire whether the evidence presents a sufficient disagreement to require the submission of the case to the fact-finder or whether the evidence is so one-sided that one party must prevail as a matter of law. Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th

Cir. 2005).  The moving party bears the burden of demonstrating an absence of a genuine issue of

material fact.  Simpson v. Des Moines Water Works, 425 F.3d 538, 541 (8th Cir. 2005).


### III.    LEGAL DISCUSSION

ERISA regulates employee benefit plans, including employee welfare benefit plans.  ERISA

defines an "employee welfare benefit plan" as:

> any plan, fund, or program which was heretofore or is hereafter established or
> maintained by an employer or by an employee organization, or by both, to the extent
> that such plan, fund, or program was established or is maintained for the purpose of
> providing for its participants or their beneficiaries, through the purchase of insurance
> or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the
> event of sickness, accident, disability, death or unemployment, or vacation benefits,
> apprenticeship or other training programs, or day care centers, scholarship funds, or
> prepaid legal services . . . .

29 U.S.C. § 1002(1).  A  participant in an ERISA-regulated plan, or the beneficiary, may bring a

civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under

the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29

U.S.C. § 1132(a)(1)(B).  The parties agree that the Plan is governed by ERISA.  Marden filed this

action to recover benefits under the Plan.

The Eighth Circuit Court of Appeals discussed the standard of review to be used in ERISA

cases in Manning v. Am. Republic Ins. Co., 604 F.3d 1030 (8th Cir. 2010):

> When a plan reserves "discretionary power to construe uncertain terms or to
> make eligibility determinations . . . the administrator's decision is reviewed only for
> 'abuse ... of his discretion'" by the district court.  King v. Hartford Life & Accident
> Ins. Co., 414 F.3d 994, 998-99 (8th Cir. 2005) (en banc) (quoting Firestone Tire &
> Rubber Co. v. Bruch, 489 U.S. 101 (1989)); see also Conkright v. Frommert, 559
> U.S. ----, 130 S.Ct. 1640, 1646 (2010) (following Firestone and noting that Firestone
> established a "broad standard of deference without any suggestion that the standard
> was susceptible to ad hoc exceptions").  Under the abuse of discretion standard, the
> court must affirm the plan administrator's interpretation of the plan unless it is

arbitrary and capricious.  Midgett v. Wash. Group Int'l Long Term Disability Plan, 561 F.3d 887, 896-97 (8th Cir. 2009).

  To determine whether a plan administrator's decision was arbitrary and capricious, the court examines whether the decision was "reasonable."  King, 414 F.3d at 998-99.  Any reasonable decision will stand, even if the court would interpret the language differently as an original matter.  Id.; see also Rutledge v. Liberty Life Assurance Co., 481 F.3d 655, 659 (8th Cir. 2007) ("[W]e must affirm if a reasonable person could have reached a similar decision, given the evidence before him, not that a reasonable person would have reached that decision."); Midgett, 561 F.3d at 897.  However, this standard does not apply if the plan administrator has committed "a serious procedural irregularity" causing "a serious breach of the plan administrator's fiduciary duty to the claimant," in which case the court applies a less deferential standard of review.  Pralutsky v. Metro. Life Ins. Co., 435 F.3d 833, 837 (8th Cir. 2006) (internal citations omitted).

  A conflict of interest exists when a plan administrator holds the dual role of evaluating and paying benefits claims, such as when the employer both determines eligibility for benefits and pays the benefits.  Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 128 S.Ct. 2343, 2346 (2008).  If such a conflict exists, then a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits. The significance of this factor depends on the circumstances of the particular case.  Id.  When an insurer has a history of biased claims administration, the conflict "may be given substantial weight."  Id.  When an insurer has taken steps to reduce the risk that the conflict will affect eligibility determinations, the conflict "should be given much less weight." Id.

  Here, [the defendant insurance company] was both the evaluator of whether benefits were owed and the entity responsible for paying those benefits.  The record contains evidence of neither biased claims administration nor efforts to reduce the risk of such administration.  Accordingly, like in Darvell v. Life Ins. Co. of North America, 597 F.3d 929, 934 (8th Cir. 2010), the court gives the conflict some weight.

Manning, 604 F.3d at 1038-39.

In this case the Plan is administered by MetLife.  The "Burlington Northern Santa Fe Long

Term Disability Program" states:

**Program Administrator**
The Program Administrator's name, address and telephone number are as follows:

Employee Benefits Committee
c/o BNSF Railway Company
. . .

The Employee Benefits Committee of BNSF Railway Company is the Program Administrator.  <u>The insurance company that has issued the group LTD insurance contract in effect at the time you become Disabled has the discretionary authority to make initial disability determinations and to respond to and process all written requests for an ERISA appeal filed in a timely manner by Program participants.  The insurance company's discretion extends to interpreting the provisions of the group LTD policy and this SPD, including resolving discrepancies or ambiguities, correcting errors, or supplying information to correct any omissions</u>.  BNSF Employee Benefits Committee retains the discretionary authority to determine whether an employee is eligible for initial or continued enrollment in the Program.

. . .

**Claims Administrator and Insurance Company**
The Claims Administrator and insurance company issuing a group LTD contract to the Program is:

Metropolitan Life Insurance Company ("MetLife")
. . .

**Named Fiduciary**
Metropolitan Life Insurance Company is the Named Fiduciary under ERISA for all ERISA appeals regarding LTD Program benefit matters.  The BNSF Employee Benefits Committee retains the discretionary authority to determine eligibility and enrollment rights under the LTD Program.

<u>See</u> Docket No. 28-1, pp. 31-32.  The Plan gives MetLife discretionary authority to determine Plan members' eligibility for long term disability benefits.  Therefore, the Court will review MetLife's decision to deny Marden's claim under an abuse of discretion standard.  <u>Glenn</u>, 554 U.S. at 111.

The Court will consider MetLife's possible conflict of interest as a factor in determining whether MetLife abused its discretion.  <u>Id.</u>  The possible conflict of interest is not dispositive, but one of "several different considerations" of which the Court will take account.  <u>Id.</u> at 117.

Under an abuse of discretion standard, a plan administrator's decision will be upheld if it is

reasonable. Manning, 604 F.3d at 1039 (citing King, 414 F.3d at 998-99). The Eighth Circuit has

outlined five factors to be used by district courts when determining the reasonableness of a plan

administrator's decision:

> The factors are the following: (1) whether the administrator's language is contrary
> to the clear language of the plan; (2) whether the interpretation conflicts with the
> substantive or procedural requirements of ERISA; (3) whether the interpretation
> renders any language in the plan meaningless or internally inconsistent; (4) whether
> the interpretation is consistent with the goals of the plan; and (5) whether the
> administrator has consistently followed the interpretation. [Finley v. Special Agents
> Mut. Benefit Ass'n, 957 F.2d 617, 621 (8th Cir. 1992)]. However, "the dispositive
> principle remains . . . that where plan fiduciaries have offered a reasonable
> interpretation of disputed provisions, courts may not replace it with an interpretation
> of their own-and therefore cannot disturb as an abuse of discretion the challenged
> benefits determination." [Darvell v. Live Ins. Co. of N. Am., 597 F.3d 929, 935 (8th
> Cir. 2010)] (citation omitted).

Id. at 1041-42.

Marden contends that MetLife abused its discretion when it denied his claim for long term

disability benefits. Marden asserts that he has radiculopathy and therefore qualifies for benefits past

24 months. The relevant portion of the "Burlington Northern Santa Fe Long Term Disability

Program" states:

> **Limitation For Disabilities Due to Particular Conditions**
> You are covered for 24 months of Disability during your lifetime if you are Disabled
> due to a:
>
> . . .
>
> 2.     Neuromusculoskeletal and soft tissue disorder including, but not limited to,
> any disease or disorder of the spine or extremities and their surrounding soft
> tissue; including sprains and strains of joints and adjacent muscles, unless the
> Disability has objective evidence of:
>
>      . . .

c.      radiculopathies;

. . .

**Glossary of Terms Used in This Section**

. . .

Spinal:  Components of the bony spine or spinal cord.

. . .

Radiculopathies:  Disease of the peripheral nerve roots supported by objective clinical findings of nerve pathology.

<u>See</u> Docket No. 28-3, pp. 75-76.

Dr. Barry Ostroff, a consultant for MetLife, conducted a review of Marden's medical records and spoke with his treating physicians.  Regarding the diagnosis of radiculopathy, he reported:

> This presumptive diagnosis was first listed by Dr. Johnson in his 11/3/06 office note but was not supported by lumbar MRI findings, clinical examination findings from any of the claimant's medical providers, or a 3/11/09 lower extremity electrodiagnostic study performed by Greg Peterson, MD, physiatrist.  As noted above, the lumbar MRI findings were limited to degenerative disc disease without evidence of neural foraminal encroachment or nerve root compression.  Neurological examinations recorded by the claimant's multiple medical providers lacked significant neurological deficits.  The 3/11/09 lower extremity electrodiagnostic study performed by Dr. Peterson was reportedly negative for evidence of radiculopathy.  Although the claimant complained of intermittent pain radiating to his legs, left greater than right, <u>his clinical picture was more consistent with radiculitis related to degenerative lumbar disc disease and not radiculopathy which by definition would require evidence of actual damage to the nerve root at the level of the spine such as could occur with nerve root compression caused by a herniated disc</u>.  During my 9/9/09 teleconference with Dr. Kihtir, she confirmed that there was no evidence of nerve root compression and that the claimant had discogenic pain with some referral of pain to his legs due to nerve irritation.

<u>See</u> Docket No. 28-1, p. 74 (emphasis added).  Dr. Peterson told Dr. Ostroff that he performed a lower extremity EMG/NCV study on Marden on March 11, 2009, and that the study was "negative for evidence of radiculopathy, peripheral neuropathy, or focal neuropathy."  <u>See</u> Docket No. 28-1,

p. 73.  Dr. Sena Kihtir confirmed that the testing performed by Dr. Peterson "was negative for evidence of a lumbar radiculopathy or peripheral neuropathy and remarked that his testing was always extremely thorough."  See Docket No. 28-1, p. 73.

Marden argues MetLife has misinterpreted the language of the Plan and asserts radiculopathy and radiculitis are "interchangeable under the definitions of the policy, as they both deal with a disease of the nerve root causing radiating pain."  See Docket No. 34-1, p. 5.  Dorland's Illustrated Medical Dictionary defines radiculopathy as "disease of the nerve roots" and defines radiculitis as "inflammation of the root of a spinal nerve, especially of that portion of the root which lies between the spinal cord and the intervertebral canal."  Dorland's Illustrated Medical Dictionary 1405 (26th ed. 1988).  Therefore, radiculopathy is a "disease," while radiculitis is an "inflammation."  Dorland's defines disease as "any deviation from or interruption of the normal structure or function of any part, organ, or system (or combination thereof) of the body that is manifested by a characteristic set of symptoms and signs and whose etiology, pathology, and prognosis may be known or unknown."  Id. at 481.  Dorland's defines inflammation as:

> a localized protective response elicited by injury or destruction of tissues, which serves to destroy, dilute, or wall off (sequester) both the injurious agent and the injured tissue.  It is characterized in the acute form by the classical signs of pain (dolor), heat (calor), redness (rubor), swelling (tumor), and loss of function (functio leasa).  Histologically, it involves a complex series of events, including dilation of arterioles, capillaries, and venules, with increased permeability and blood flow; exudation of fluids, including plasma proteins; and leukocytic migration into the inflammatory focus.

Id. at 835.  "Disease" and "inflammation" are not identical or interchangeable terms.  Therefore, radiculopathy and radiculitis are not interchangeable terms.  The Court finds that MetLife did not misinterpret the Plan and MetLife's language is not contrary to the clear language of the Plan.

The Court finds MetLife's interpretation of the Plan does not violate the procedural or substantive requirements of ERISA. The language of the Plan does not mislead employees. King, 414 F.3d at 1008-09; 29 U.S.C. § 1022. Nor does MetLife's review and interpretation of the Plan and its review of Marden's medical records violate the procedural or substantive requirements of ERISA.

The Court finds MetLife's interpretation of the Plan does not render any language in the Plan meaningless or internally inconsistent. As explained above, MetLife properly determined that radiculitis and radiculopathy are not identical diagnoses. The objective medical evidence reveals that Marden suffers from radiculitis, not radiculopathy. Accordingly, Marden's long term disability benefits are limited to twenty-four months by the terms of the Plan.

The Court finds that MetLife's interpretation of the Plan is consistent with the goals of the plan. The Plan states, "The BNSF Long Term Disability (LTD) Program provides you with a steady income of an illness or injury leaves you Disabled and unable to work. The Program helps to continue a portion of your wages while you are Disabled." See Docket No. 28-1, p. 4. MetLife's interpretation of the Plan did continue a portion of Marden's wages after he became disabled, though the benefits were limited to twenty-four months.

The Court is unable to determine whether MetLife has consistently followed this interpretation. The parties did not provide evidence as to MetLife's interpretation of the Plan in other instances.

After carefully considering the factors outlined in Finley, the Court finds that MetLife's interpretation of the Plan and its denial of Marden's claim for long term disability benefits is reasonable. The objective medical evidence, especially the testing conducted by Dr. Peterson, reveal

that Marden does not suffer from radiculopathy. Dr. Ostroff's determination that Marden has radiculitis rather than radiculopathy is a reasonable interpretation of Marden's medical records. Dr. Johnson diagnosed Marden with radiculopathy in 2006, but the testing conducted by Dr. Peterson in 2009 contradicted this diagnosis. The Court finds the diagnosis of radiculopathy three years prior to the testing conducted by Dr. Peterson does not create a genuine issue of material fact precluding summary judgment. MetLife's interpretation of the undisputed facts of Marden's medical record was not unreasonable, and there was no abuse of discretion. MetLife's interpretation of the Plan was not arbitrary and capricious. As a result, MetLife's motion for summary judgment is granted.

## IV. <u>CONCLUSION</u>

The Court has carefully considered the parties' briefs, the entire record, and relevant case law. MetLife's motion for hearing (Docket No. 30) is **DENIED**. MetLife's motion for summary judgment (Docket No. 27) is **GRANTED**.

**IT IS SO ORDERED.**

Dated this 5th day of June, 2012.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court